UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NEW ENGLAND ANTI-VIVISECTION SOCIETY<br><br>ANIMAL LEGAL DEFENSE FUND<br><br>INTERNATIONAL PRIMATE PROTECTION LEAGUE,<br><br>    Plaintiffs,<br><br>    v.<br><br>SONNY PERDUE, Secretary<br>United States Department of Agriculture<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.   This is a complaint for declaratory and injunctive relief to require the United States Department of Agriculture ("USDA") to provide a substantive response to a Petition for rulemaking that was submitted to the agency by Plaintiffs—New England Anti-Vivisection Society ("NEAVS") and the Animal Legal Defend Fund ("ALDF")—on May 7, 2014.  Plaintiff International Primate Protection League ("IPPL") joined as an additional petitioner on May 19, 2015. The Petition requests that the USDA promulgate standards to promote the psychological well-being of primates used in research, pursuant to the requirements of the Animal Welfare Act ("AWA"), 7 U.S.C. § 2143(a)(2)(B). The standards that Plaintiffs request mirror those adopted in 2013 by the National Institutes of Health ("NIH") for chimpanzees used in federally-funded

research. NIH adopted these standards to ensure "ethologically appropriate physical and social environments" for chimpanzees, meaning "captive environments that do not simply allow, but also, importantly, promote a full range of behaviors that are natural" for these primates. Promulgation of the requested regulations is necessary to provide *all* non-human primates used in research the environmental enrichment they need, and to establish clear, specific standards that can be uniformly implemented and enforced by the USDA across research institutions. Adoption of the requested standards will ensure that the USDA meets the AWA's mandate that the USDA "*shall* promulgate standards …for a physical environment adequate to promote the psychological well-being of primates." 7 U.S.C. § 2143(2)(B) (emphasis added).

2. The Administrative Procedure Act ("APA"), 5 U.S.C. § 555(b), requires federal agencies to respond to all rulemaking petitions within a "reasonable" period of time. The USDA has violated this provision by failing to provide Plaintiffs with a substantive response to their Petition, which Plaintiffs submitted on May 7, 2014. Accordingly, Plaintiffs seek a declaration that the agency has violated the APA, and an order compelling the agency to provide Plaintiffs with a substantive response to their Petition.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1361, and 2201.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

5. Plaintiff NEAVS is a national non-profit organization that advocates in favor of using modern technology, such as computer modeling, to replace the use of live animals in

scientific experiments. NEAVS has over 25,000 members throughout the country and employs researchers, scientists, and attorneys to study and expose animal cruelty in laboratories and to find ethical and efficient alternatives to animal testing. NEAVS's headquarters are located at 333 Washington Street, Suite 850, Boston, MA 02108.

6. Plaintiff ALDF is a national non-profit organization headquartered in Coati, California, with over 200,000 members and supporters nationwide with a mission to protect the lives and advance the interests of animals through the legal system. ALDF's activities include legal advocacy and education on behalf of nonhuman primates and other animals used in research. ALDF's headquarters are located at 525 East Cotati Avenue, Cotati, CA 94931

7. Plaintiff IPPL is a grassroots nonprofit organization dedicated to protecting the world's primates. Its goal is to keep primates safe from human cruelty, negligence, and exploitation. IPPL's mailing address is P.O. Box 766, Summerville, SC 29484.

8. Defendant Sonny Perdue is the Secretary of the United States Department of Agriculture, which is the federal agency responsible for promulgating and enforcing federal regulations implementing the AWA. As such, Defendant Perdue is responsible for providing Plaintiffs with a substantive response to their May 7, 2014 rulemaking Petition.

**FACTS GIVING RISE TO PLAINTIFFS' REQUEST FOR RELIEF**

A. **AWA Requirements for the Psychological Well-Being of Primates**

9. The AWA was enacted to "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1). The statute directs the Secretary of the USDA to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1).

10. In 1985, the AWA was amended to provide that such standards "shall include minimum requirements … for a physical environment adequate to promote the psychological well-being of primates." *Id.* at § 2143(a)(2).

B. **The USDA's Implementation of the AWA's Requirement**

11. In 1991, the USDA promulgated regulations intended to implement the 1985 amendment. 9 C.F.R. § 3.81. However, those regulations allow the regulated entities, including research facilities, to develop and follow their own "plan" to provide "environment enhancement adequate to promote the psychological well-being of nonhuman primates." *Id.* This plan must only "be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." *Id.* Although the regulations require that the developed plan "include specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature," the regulations do not indicate what is necessary to "address" such needs, nor do they mandate that primate species that require social contact with members of their own species be housed together. *Id.* Additionally, while the regulations require that each plan provide a "physical environment" that is "enriched by providing means of expressing noninjurious species-typical activities," 9 C.F.R. § 3.81(a)–(b), the regulations do not further clarify this provision nor specify which activities must be accommodated. Furthermore, although the regulations acknowledge that particular categories of primates, including (a) infants and young juveniles; (b) animals that show signs of psychological distress; (c) those housed alone; and (d) great apes of a certain size, require "special considerations," 9 C.F.R. § 3.81(c), this term is similarly not defined. Finally, there is no requirement that the plan be reviewed by, or even disclosed to, the USDA.

12. Even after the promulgation of the 1991 regulations, laboratory primates continued to be housed in conditions detrimental to their psychological well-being. In 2011, at the NIH-sponsored Symposium on Animal Welfare and Scientific Research, a participant lamented the heartbreaking truth—that housing for primates has not changed in decades: "[i]f you show a picture of a primate cage from 40 years ago and a primate cage now, it's basically the same: it's all metal with a perch added." Proceedings of the Symposium on Animal Welfare and Scientific Research: 1985-2010, 2011.

13. The USDA itself has long acknowledged that the current regulations are difficult to enforce. In 1999, the USDA's Animal and Plant Inspection Service ("APHIS"), which is charged with enforcing the AWA, found that "dealers, exhibitors, and research facilities did not necessarily understand how to develop an environment enhancement plan that would adequately promote the psychological well-being of nonhuman primates." 64 Fed. Reg. 38145, 38148. Indeed, APHIS inspectors "requested information and clarification on how to judge whether someone was meeting the requirements in § 3.81 [of the AWA's implementing regulations]." *Id*. The agency also observed "confusion among the regulated public concerning on what basis they will be judged by inspectors as meeting or not meeting the requirements." *Id*. APHIS concluded that "additional information on how to meet the standards of § 3.81 is necessary." *Id*.

14. In response to these concerns, in 1999 APHIS formulated a "Draft Policy" intended "to be used by dealers, exhibitors, and research facilities as a basis in developing plans under § 3.81 for environmental enhancement to promote the psychological well-being of nonhuman primates." *Id*. The Draft Policy identified five elements as "the minimum" that must be addressed in order to comply with § 3.81. *Id*. These five elements were social grouping; social needs of infants; structure and substrate; foraging opportunities; and manipulanda—i.e., the

5

opportunity for primates to manipulate objects in their environment. *Id.* Each element was identified as "*critical* to environments that adequately promote the psychological well-being of nonhuman primates." 64 Fed. Reg. at 38147 (emphasis added). APHIS published the Draft Policy in the Federal Register on July 15, 1999, explaining that it was "seeking public comment on the draft policy" before implementing it. *Id.* at 38145. However, that Draft Policy was never implemented, and to date, no changes have been made to the primate regulations since they were first promulgated in 1991. 9 C.F.R. § 3.81.

15. Meanwhile, since the promulgation of the 1991 regulations, a substantial body of scientific evidence has been generated demonstrating the psychological capabilities and needs of primates, the ethical responsibilities of humans towards them, and the implications of psychological well-being (or lack thereof) of primates used in research to obtain scientifically valid research results.

16. Nonhuman primate species used in research share many cognitive abilities with humans: they have active minds and inquisitive natures; are inventive and sociable; develop caring relationships with others; make and use tools; develop rudimentary cultures; have complex emotions; analyze past results; imagine different outcomes; experience regret; appear to understand others' perceptions, thoughts, and feelings; and have a sense of justice and fairness. *See* Petition at 21 (and Scientific Literature cited therein).

17. Primates living in an artificial environment where stressors are ever present and unpredictable develop a condition called "learned helplessness" because of the animals' complete inability to deter, escape, or fight off harm or hardship. Primates maintained under such conditions also develop pathological behaviors and suffer severe stress due to confinement, little or no social or mental enrichment, and a complete lack of control over their environment.

Primates in research facilities commonly engage in abnormal behaviors—called stereotypic behaviors—such as rocking, swaying, repetitive circling, over-grooming to the point of permanent damage to their skin, biting themselves, banging themselves against the cage, and other forms of self-harm and self-mutilation. Petition at 37. These behaviors are not natural for primates, and are the result of extreme and prolonged psychological distress. *Id.*

      C.      **The National Institute of Health's Standards for Chimpanzees**

18. In December 2010, the Institute of Medicine—at the request of the National Institute of Health and in collaboration with the National Research Council—convened the Committee on the Use of Chimpanzees in Biomedical and Behavioral Research to consider the necessity of the use of chimpanzees in NIH-funded research, given the current state of scientific knowledge about nonhuman primates, and especially chimpanzees. The Committee's Report, completed in December of 2011, introduced the concept of the need for "ethologically appropriate physical and social environments" for such primates, that is, "captive environments that do not simply allow but also, importantly, promote a full range of behaviors that are natural for chimpanzees." 78 FR 39741, 39743. The Committee Report concluded:

> Chimpanzees live in complex social groups characterized by considerable interindividual cooperation, altruism, deception, and cultural transmission of learned behavior (including tool use). Furthermore, laboratory research has demonstrated that chimpanzees can master the rudiments of symbolic language and numericity, that they have the capacity for empathy and self-recognition, and that they have the humanlike ability to attribute mental states to themselves and others (known as the "theory of mind"). Finally, in appropriate circumstances, chimpanzees display grief and signs of depression that are reminiscent of human responses to similar situations. It is generally accepted that all species, including our own, experience a chronic stress response (comprising behavioral as well as physiological signs) when deprived of usual habitats, which for chimpanzees includes the presence of conspecifics and sufficient space and environmental complexity to exhibit species-typical behavior. Therefore, to perform rigorous (replicable and reliable) biomedical and behavioral research, it is critical to minimize potential sources of stress on the chimpanzee. Institute of Medicine, *Chimpanzees in Biomedical and Behavioral Research: Assessing the Necessity,* The National Academies Press (2011).

19. In response to this Committee Report, the NIH Council of Councils ("CoC") formed the Working Group on the Use of Chimpanzees in NIH-Supported Research. The Working Group spent several years analyzing the use of chimpanzees in research, and exploring the potential to create environments that not only allowed *but affirmatively promoted* natural behaviors and psychological well-being for chimpanzees used in laboratory research. The Working Group's final recommendations, unanimously approved by the full CoC, concluded that any and all potential future use of chimpanzees must be subjected to a strict independent oversight committee to assess whether that use is acceptable, critical, and compliant with Institute of Medicine guidelines, including housing these primates in an ethologically appropriate environment.

20. The CoC submitted the report to NIH, and on June 26, 2013, after considering public comments, the NIH accepted nearly all of the CoC's findings, including nine of ten recommendations regarding ethologically appropriate environments. These recommendations provide concrete minimum standards for environments in which chimpanzees are held, including standards to address specific physical and social needs.

21. The NIH-adopted recommendations, presented and discussed in great detail in Plaintiffs' Petition, are as follows.

    a. NIH Recommendation #1: Chimpanzees must have the opportunity to live in sufficiently large, complex, multi-male, multi-female social groupings, ideally consisting of at least 7 individuals. Unless dictated by clearly documented medical or social circumstances, no chimpanzee should be required to live alone for extended periods of time. Pairs, trios, and even small groups of 4 to 6 individuals do not provide the social complexity required to meet the social needs of this cognitively advanced species. When chimpanzees need to be housed in groupings that are smaller than ideal for longer than necessary, for example, during routine veterinary examinations or when they are introduced to a new social group, this need should be regularly reviewed and documented by a veterinarian and a primate behaviorist.

b. NIH Recommendation #2: Chimpanzees must be housed in environments that provide outdoor access year round. They should have access to natural substrates, such as grass, dirt, and mulch, to enhance environmental complexity.

c. NIH Recommendation #3: Ethologically appropriate handling of chimpanzees must include provision of foraging opportunities and of diets that are varied, nutritious, and challenging to obtain and process.

d. NIH Recommendation #4: Chimpanzees should have the opportunity to climb at least 20 ft (6.1 m) vertically. Moreover, their environment must provide enough climbing opportunities and space to allow all members of larger groups to travel, feed, and rest in elevated spaces.

e. NIH Recommendation #5: Chimpanzees must be provided with materials to construct new nests on a daily basis.

f. NIH Recommendation #6: The environmental enrichment program developed for chimpanzees must provide relevant opportunities for choice and self-determination.

g. NIH Recommendation #7: Chimpanzee management staff must include experienced and trained behaviorists, animal trainers, and enrichment specialists to foster positive human–animal relationships and provide cognitive stimulation. Given the importance of trainer/animal ratios in maintaining trained behaviors, a chimpanzee population of 50 should have at least 2 dedicated staff members with this type of expertise. Positive reinforcement training is the only acceptable method of modifying animal behaviors to facilitate animal care. Training plans should be developed for each animal, and progress toward achieving established benchmarks should be documented.

h. NIH Recommendation #8: All personnel working with chimpanzees must receive training in core institutional values promoting psychological and behavioral well-being of chimpanzees in their care. These institutional core values should be publicly accessible.

i. NIH Recommendation #9: Chimpanzee records must document detailed individual animal social, physical, behavioral, and psychological requirements. These requirements should be used to provide appropriate individualized chimpanzee management.

22. Many of these recommendations correspond to the same elements that APHIS included in its 1999 Draft Policy as critical to promoting the psychological well-being of primates. 64 Fed. Reg. 38145, 38147.

23. As explained by former APHIS Deputy Administrator Dale Schwindaman, the USDA and NIH have a history of working "together to ensure harmonized animal welfare requirements by those two agencies." Petition at 4. The AWA itself stresses the importance of this relationship by providing that the Secretary of Agriculture "shall consult with the Secretary of Health and Human Services" (the parent agency to NIH) prior to issuing regulations. 7 U.S.C. § 2145.

D. **Plaintiffs' Petition**

24. On May 7, 2014, pursuant to the APA, Plaintiffs NEAVS and ALDF submitted to the USDA a petition for rulemaking requesting the USDA to promulgate specific, enforceable regulations to promote the psychological well-being of all non-human primates used in research. Plaintiffs' recommendations are similar to the requirements adopted by NIH for chimpanzees.

25. Plaintiffs' Petition includes evidence demonstrating that, according to APHIS itself, the current regulations cause "confusion among the regulated public concerning on what basis they will be judged by inspectors as meeting or not meeting the requirements," and that "additional information on how to meet the standards of § 3.81 is necessary." 64 Fed. Reg. 3845, 38148.

26. The Petition further documents that the current lack of clear and enforceable standards is extremely detrimental to the psychological well-being of primates used in research. The Petition provides concrete examples of the prolonged and unnecessary suffering of specific

primates due to inadequacies in the current regulatory scheme. For example, Plaintiffs document that:

- A February 2012 inspection report for Virginia Commonwealth University notes, "Numerous animals in the primate colony participating in protocol AM10123 have areas of hair loss on their bodies, possibly due to over grooming. In nonhuman primates, over grooming can be an indicator of psychological distress. There is not sufficient evidence that personnel have fully recognized and addressed this problem."

- An August 2010 inspection report for Drug Research Laboratories in Pennsylvania states, "The environment enhancement plan for the facility states that the animals will receive some type of fresh fruit or vegetable daily. The plan is not being followed. According to the enrichment logs reviewed the 16 animals are only receiving fresh produce twice a week."

- A July 2010 inspection report for Boston University states, "Protocol AN-14560, which has been closed since Dec. 2009, used Nonhuman Primates (NHPs) that were housed individually in isolation chambers which provided limited inter- and intra-species interaction with light cycle changes which for 3 month periods included constant dim light. Two animals were reported as having behaviors indicating psychological distress in their health records and behavioral assessments in the form of hair plucking (2/06 and 11/07) and various stereopathic displays (10/06-4/08). Based on the facility's Plan for Environmental Enrichment for NHPs these animals should have been put on special enrichment or removed from the study."

27. Plaintiffs' Petition requests that the USDA adopt the aforementioned NIH-accepted recommendations for *all* chimpanzees used in research, regardless of whether the research is federally funded. The Petition also requests that the agency "[a]dopt clear regulations for ethologically appropriate environments for all primates using NIH's recommendations for such environments for chimpanzees as a baseline, with species-specific modifications for other primates" such as macaques, marmosets, and baboons—tens of thousands of which are still being used in research in this country.

28. As the Petition discusses, adapting the NIH recommendations to apply to all primate species used in research is essential "to promote the psychological well-being of

primates," in compliance with the USDA's mandate under the AWA. 7 U.S.C. § 2143(a)(1). Plaintiffs explain in great detail that other species of primates have psychological needs similar to those of chimpanzees. Indeed, according to Brian Hare, Ph.D., a nationally recognized primate expert at Duke University who testified before the IOM, "[m]ost of what you know about great apes is also true about monkeys." *See,* Brandon Keim, "Medical experimentation on chimps is nearing an end. But what about monkeys?" *Wired Science* (2013).

29.     Plaintiffs also explain in their Petition that adapting the NIH recommendations to address the psychological needs of other primate species is entirely feasible. As preeminent animal scientist and primatologist Dr. Marc Bekoff explained when commenting on Plaintiffs' Petition:

> I will first address the comments of some that have argued that to do so [that is, to "define clear measures and ways of identifying the basic needs of all primates that would contribute to their psychological well-being when held in the artificial captive environment"] is an impossibility given the large number of species held in US captive situations, most notably in relation to this rulemaking petition in U.S. laboratories. Such arguments defy logic and have no scientifically valid platform on which to rest. Since all primates share a common mammalian brain and are social, intelligent beings, the degree of similarities in their needs far outweighs any differences which have been inflated by industry to try convince USDA to not help their own investigators identify components in primates' environments or caregiving that would enhance rather than further compromise their psychological wellbeing.

Docket No. APHIS-2014-0098-9944 (September 1, 2015).

30.     In addition to requesting that the USDA implement the NIH-adopted recommendations for chimpanzees, and tailor and implement the NIH-adopted regulations for all other primate species used in research, the Petition also requests the USDA to adopt regulations defining when primates experience psychological distress, and delineating what steps must be taken to address that distress when it occurs. As Plaintiffs' Petition explains, "[l]aboratory conditions and experiences involving diverse experimental procedures and frequent anesthetics

commonly lead to acute and long-term mental and physical breakdown. As such, stress can result in both psychological damage as well as severe physiological consequences for an individual." Petition at 35.

31. Plaintiffs' Petition further documents that frequent stress associated with living in laboratory conditions and participating in scientific experiments causes a wide array of harmful stereotypic behaviors in non-human primates, including "over-grooming or hair-pulling to the point of injury or permanent damage or scarring to skin or follicles, hitting and/or biting one's self, banging one's self against the cage, pacing, twirling, rocking, back-flipping, swaying, eye-covering, self-clasping, repetitive circling, and digit-sucking." Petition at 37. The Petition further explains that "nonhuman primates live in constant fear and uncertainty about if and when they will be subjected to an experimental procedure"—a phenomenon known as an anticipatory stress response. Petition at 34. Thus, "[d]ue to prior adverse experiences, individual animals become hyper-vigilant, anticipating the recurrence of those experiences—much like adopted dogs that have suffered previous traumas flinch when approached by people." *Id.*

32. Plaintiffs' Petition requests the USDA to promulgate regulations designed to identify, address, and take steps to ameliorate these behaviors when they occur. Petition at 48.

33. The Petition provides concrete examples of extreme psychological distress suffered by individual primates as a result of the current regulatory framework failing to address the prevention and treatment of stereotypic behaviors, and provides evidence demonstrating that when these conditions are addressed the primate's psychological condition can dramatically improve. Petition at 36–37.

34. Plaintiffs' Petition further explains that psychological distress experienced by primates used in research can have negative impacts on the scientific validity of the results of such research. Petition at 46.

35. Plaintiffs' Petition demonstrates that the lack of clarity in the current USDA regulatory regime is insufficient to properly prevent such psychological distress, and that "the current lack of clear, enforceable minimum standards to accomplish this objective has contributed to the proliferation of severe maladaptive behaviors and other psychosocial and cognitive symptoms in nonhuman primates that are held in captivity." Petition at 42. Plaintiffs' Petition urges the USDA to amend the current regulations to include criteria for determining when primates are experiencing psychological distress and mandatory steps that must be taken to ameliorate this distress when it occurs.

### E. The USDA's Initial Response to Plaintiffs' Petition

36. APHIS responded to the Plaintiffs' Petition in a letter addressed to Plaintiffs' counsel dated May 20, 2014 from Chester Gipson, DVM. Dr. Gipson stated that, "[w]e believe that the issues raised in the petition are important and that many parties will have an interest in them." He further stated that, "[a]ccordingly, we will publish the petition in a Federal Register notice in the near future to solicit public comment," and that "[o]nce we have analyzed all of the comments received, we will decide what action, if any, we should take in response to this request."

37. On May 1, 2015, APHIS published public notice of the Petition in the Federal Register, stating that it was "making this petition available to the public and soliciting comments regarding the petition and any issues raised by the petition that we should take into account as we consider this petition." 80 FR 24840, 24841. On May 19, 2015, IPPL became a co-petitioner on

the Petition, and on July 24, 2015, APHIS published a second notice reopening the comment period to give interested persons additional time to prepare and submit comments. 80 FR 43969. That comment period ended on August 31, 2015.

38. APHIS received a total of 10,137 comments—the overwhelming majority of which supported adoption of Plaintiff's Petition. Docket No. APHIS-2014-0098. For example, Dr. Marc Bekoff urged the USDA to implement clear regulatory language in order to promote the psychological well-being of captive primates:

> As cognitive beings capable of complex thinking and able to make decisions in the wild through which they protect themselves, provide for what they enjoy doing most, or help solidify bonds with other members of their group, providing for all these needs cannot be seen as a 'regulatory burden' to the research facility. Rather, laboratories must accept, if they continue to choose to conduct animal work over other forms of modern scientific investigation, that because they chose to work with a living being, there is, by definition, an added regulatory cost of doing business

APHIS-2014-0098-9944 (September 1, 2015).

39. Although Plaintiffs' Petition was submitted five and a half years ago, to date the USDA has failed to provide Plaintiffs with any substantive response to the Petition.

40. Meanwhile, tens of thousands of primates used in AWA-regulated research have suffered and will continue to suffer in solitary cages with little or nothing to do. These primates may receive no comfort from others of their species, no opportunity to engage in natural, healthy behaviors, no sunshine or fresh air, and no appropriate mental or sensory stimulation. As a result of these conditions, these living, thinking, feeling beings will continue to suffer both physically and psychologically, and will pull out their hair, scar their skin, bite their bodies, and fling themselves against their cages in loneliness and desperation.

**PLAINTIFFS' CLAIMS FOR RELIEF**

41. The APA requires an agency to "conclude a matter presented to it" within "a reasonable time." 5 U.S.C. 555(b).

42. The USDA has failed to comply with this requirement, to the detriment of the Plaintiff organizations and the primates they seek to protect.

43. Accordingly, the USDA has "unreasonably delayed" agency action within the meaning of the APA, 5 U.S.C. § 706(1).

44. Because Plaintiffs petitioned the USDA to take the required action, the agency's unreasonable delay in responding to that Petition has caused them injury in fact that would be remedied if the USDA were to provide them a substantive response to their Petition.

**WHEREFORE**, Plaintiffs request that the Court enter an Order:

1. Declaring that Defendant's delay in providing Plaintiffs a substantive response to their Petition is unreasonable within the meaning of 5 U.S.C. § 706(1);

2. Requiring Defendant forthwith to provide Plaintiffs with a substantive response to their Petition;

3. Awarding Plaintiffs their reasonable attorney's fees and costs for this action; and

4. Granting Plaintiffs such other and further relief as may be just and proper.

Respectfully submitted,

/s/ Melissa C. Allison
Melissa C. Allison (BBO No. 657470)
David B. Lyons (BBO No. 699505)
Anderson & Kreiger LLP
50 Milk Street, 21st Floor
Boston, MA  02109
617-621-6512
mallison@AndersonKreiger.com
dlyons@andersonkreiger.com

/s/ Katherine A. Meyer
Katherine A. Meyer
(D.C. Bar No. 244301)
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA  02138
617-998-2450
kmeyer@law.harvard.edu
(*Motion for Pro Hac Vice Pending*)
Attorneys for Plaintiffs

Date:   November 6, 2019